**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

JIMMY SUTTON,

      Plaintiff,

v.                                    Civil Action No. _____

PORTFOLIO RECOVERY ASSOCIATES LLC;
EXPERIAN INFORMATION SOLUTIONS INC.;
EQUIFAX INFORMATION SERVICES LLC; and
TRANS UNION LLC,

      _____ Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, JIMMY SUTTON, by and through his undersigned Counsel, alleges the following against Defendants PORTFOLIO RECOVERY ASSOCIATES LLC, EXPERIAN INFORMATION SOLUTIONS INC., EQUIFAX INFORMATION SERVICES LLC, and TRANS UNION LLC:

## PRELIMINARY STATEMENT

1.     This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §§ 1681a–x.

2.     Plaintiff is the victim of what is now a common crime—identity theft. Fraudsters used Plaintiff's personal information to open credit accounts with Synchrony Bank without Plaintiff's knowledge or consent. Synchrony eventually referred the fraudsters' defaulted accounts to Portfolio for collection.

3.     Plaintiff has asserted the factual truth—the accounts did not belong to him and he did not authorize them. Yet Portfolio continues its collection attempts.

4. Portfolio also reported the inaccurate account to the Big Three credit reporting agencies ("CRAs"). Plaintiff disputed the inaccuracies to them as well, to no avail.

5. The FCRA demands of reporting agencies like Equifax, Experian, and Trans Union that they utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

6. Also when a consumer disputes the accuracy of information with the agencies, they must transmit that dispute to the entity who furnished the information, here Portfolio Recovery. Portfolio, the furnisher, must then conduct its own, independent investigation of the dispute. *Id.* § 1681s-2(b).

7. Plaintiff brings claims under Section 1681e(b) against all three reporting agencies because they reported about Plaintiff inaccurate information regarding the Portfolio account. When Plaintiff disputed the inaccuracies, the agencies did not reasonably investigate, also violating Section 1681i.

8. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how the CRA Defendants have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. The CRA Defendants have been repeatedly sued by consumers, sanctions by regulators and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had they followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

9.     Likewise, Portfolio violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the agencies and failed to reasonably investigate those disputes. Instead, discovery will show all Portfolio did was consult its own records about the account and confirm to the agencies the inaccurate information it was already reporting.

## JURISDICTION AND VENUE

10.    The jurisdiction of this Court is conferred by 15 U.S.C. § 1681(p) and 28 U.S.C. § 1367.

11.    Venue is proper in this District and Division because Portfolio maintains its principal place of business in this District and Division, the violations described in this Complaint occurred in this District, and the CRA Defendants transact business within this District and Division.

## PARTIES

12.    Plaintiff Jimmy Sutton is a natural person and a "consumer" as defined by 15 U.S.C. § 1681a(c).

13.    PORTFOLIO RECOVERY ASSOCIATES LLC is headquartered in Norfolk, Virginia and does business in the Commonwealth of Virginia through its registered agent, Corporation Service Company, located at 100 Shockoe Slip, Fl. 2, Richmond, Virginia 23219-4100.

14.    Portfolio is in the business of debt collection using instrumentalities of interstate commerce, including the consumer reporting agencies; and it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due to another.

15.    Portfolio is a "person," as defined in 15 U.S.C. § 1681a(b).  Upon information and belief, Portfolio regularly reports and furnishes information to consumer reporting agencies in its

efforts to collect debts from consumers. The information becomes components of consumers' consumer profiles in determining consumers' credit worthiness, credit standing and credit capacity.

16.     Portfolio is also a "furnisher" of information as defined by the FCRA and caselaw interpreting the statute.

17.     Defendant Experian Information Solutions, Inc. is headquartered in California and does business in the Commonwealth of Virginia through its registered agent located in Richmond, Virginia.

18.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

19.     Defendant Equifax Information Services, LLC is headquartered in Georgia and does business in the Commonwealth of Virginia through its registered agent located in Richmond, Virginia.

20.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

21.     Defendant Trans Union LLC ("Trans Union") is headquartered in Illinois and does business in the Commonwealth of Virginia through its registered agent located in Richmond, Virginia.

22.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

## FACTUAL ALLEGATIONS

***Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers***

23.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

24.     "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

25.     Section 1681i(a), on the other, hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through her dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed

information is inaccurate and record the current status of the disputed information, or delete the item from the file . . .  before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

26.    Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

27.    It has long been the law that a CRA, such as Experian, Equifax, or TransUnion, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

28.    That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).

29.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

30.     Further, as the CRA Defendants are aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

31.     It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

32.    Today, furnishers such as Portfolio and other of the CRA Defendants' furnishers, have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2.  But while the CRA Defendants' duties under § 1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much recent, enacted on in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### Plaintiff Discovers The CRA Defendants Were Inaccurately Reporting Credit Accounts That Did Not Belong To Him

33.    Sometime during 2017, while Plaintiff was a member of a now-defunct limited liability company, the other members of the LLC, committed extensive identity theft against the Plaintiff.

34.    Plaintiff promptly filed a police report when he discovered the crime. Consequently, the criminals have since confessed to their crimes against the Plaintiff.

35.    A subsequent check of Plaintiff's consumer reports revealed that the fraudsters opened two accounts with Synchrony Bank.

36.    Plaintiff has never opened any accounts with Synchrony Bank.

37.    Subsequently, on a date and time better known to Synchrony Bank and Portfolio, Synchrony Bank transferred the fraudster's defaulted accounts to Portfolio for collection.

38.    Plaintiff has constantly informed Portfolio that his identity was stolen and the fraudulent debts did not belong to him.

---

[1]  Available  at  https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

39.     Portfolio has ignored Plaintiff's documentation that his identity was stolen and the alleged accounts were fraudulently obtained, and has not only failed to close the accounts, but steadfastly continued to engage in collection activity against the Plaintiff.

### *Plaintiff Disputes The Inaccuracies With The CRAs*

40.     Having learned that Portfolio inaccurately reported the status of the accounts to the CRA Defendants, Plaintiff sent disputes to Equifax, Experian, and Trans Union to attempt to have them remove the inaccuracies from his credit reports.

41.     Plaintiff sent correspondence to Experian, requesting that Experian verify and correct the inaccurate, erroneous and unverified representations made by Portfolio on his credit file.

42.     In that letter, Plaintiff explained that the Portfolio accounts Experian was attributing to him were not his and he did not authorize them.

43.     Plaintiff sent correspondence to Equifax, requesting that Equifax verify and correct the inaccurate, erroneous and unverified representations made by Portfolio on his credit file.

44.     In that letter, Plaintiff explained that the Portfolio accounts Equifax was attributing to him were not his and he did not authorize them.

45.     Plaintiff sent correspondence to Trans Union, requesting that Trans Union verify and correct the inaccurate, erroneous and unverified representations made by Portfolio on his credit file.

46.     In that letter, Plaintiff explained that the Portfolio accounts Trans Union was attributing to him were not his and he did not authorize them.

47.    Subsequent to Plaintiff's disputes, Equifax, Experian and Trans Union failed to remove the inaccurate information regarding the Portfolio accounts contained within Plaintiff's credit reports.

### The CRA Defendants Did Not And Do Not Conduct Any Investigation Of Most Consumer Disputes

48.    Unknown to the Plaintiff until this lawsuit, it has long been the practice of both TransUnion and Equifax to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas.  Both Defendants use the same vendor, previously known as Intelenet Global Services and now as Teleperformace.

49.    This dispute processing vendor is not hired to perform an actual FCRA investigation.  Instead, its sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

50.    In fact, the CRA Defendants strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account.").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax or TransUnion. It gets sent to Defendants' creditor customer (such as Portfolio) for its sole review and consideration.

51.    Here is how it the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication.  That mailbox company receives consumer disputes, scans them into a batch of other disputes.

52.     TransUnion, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

53.     Both Equifax and Trans Union then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

54.     Teleperformance agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

55.     Equifax and Trans Union have both taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court just this year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax."  Miller v. Equifax Info. Serv., Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

56.     TransUnion has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that TransUnion did not have control or the ability to produce for deposition Indian employees of Intelenet).[2]

57.     Regardless of whether or not these statements are correct, both Equifax and Trans Union believe that they cannot direct, control, manage or reliably influence the employees of their third-party Indian outsource vendor.

58.     Equifax and Trans Union themselves did not conduct any reinvestigation of Plaintiff's many disputes.  Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *The CRA Defendants Forwarded Plaintiff's Disputes To Portfolio, Who Did Nothing*

59.     In each instance in which Plaintiff disputed the Portfolio account with the CRAs, the CRAs forwarded Plaintiff's disputes to Portfolio using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to CRAs.

60.     e-Oscar is also the system by which Portfolio has agreed it will accept such consumer disputes from the CRAs.

61.     Under such circumstances, Portfolio became obligated under the FCRA to investigate Plaintiff's disputes.

---

[2] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as he alleges against Equifax and Trans Union for their farming-out of investigations to Teleperformance.

62.   Plaintiff's disputes to Portfolio to attempt to have it reinvestigate his complaints went unanswered, as it still continues its collection activity against Plaintiff.

63.   Portfolio failed to reinvestigate Plaintiff's complaints.

64.   The information furnished by Portfolio to Equifax, Experian and Trans Union was at all times inaccurate.

65.   On or about a date better known to Experian and Portfolio, Experian furnished Plaintiff's disputes to Portfolio.

66.   Portfolio failed to reasonably reinvestigate Plaintiff's disputes that Portfolio received from Experian in violation of § 1681s-2(b)(1)(A) of the FCRA.

67.   Defendant Portfolio further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Experian and prior to the commencement of this action.

68.   Experian responded to Plaintiff's initial dispute, claiming the information was reported verified as accurate and the information was updated. This response confirms that Experian communicated Plaintiff's dispute to Portfolio.

69.   Plaintiff sent correspondence to Equifax, requesting that Equifax verify and correct the inaccurate, erroneous and unverified representations made by Portfolio on his credit file.

70.   On or about a date better known to Equifax and Portfolio, Equifax furnished Plaintiff's disputes to Portfolio.

71.   Portfolio failed to reasonably reinvestigate Plaintiff's disputes that PORTFOLIO received from Equifax in violation of § 1681s-2(b)(1)(A) of the FCRA.

72.     Defendant Portfolio further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's dispute from Equifax and prior to the commencement of this action.

73.     Equifax responded to Plaintiff's initial dispute, claiming the information was reported verified as accurate and the information was updated. This response confirms that Equifax communicated Plaintiff's dispute to Portfolio.

74.     Plaintiff sent correspondence to Trans Union, requesting that Trans Union verify and correct the inaccurate, erroneous and unverified representations made by Portfolio on his credit file.

75.     On or about a date better known to Trans Union and Portfolio, TransUnion furnished Plaintiff's disputes to Portfolio.

76.     Portfolio failed to reasonably reinvestigate Plaintiff's disputes that Portfolio received from Trans Union in violation of § 1681s-2(b)(1)(A) of the FCRA.

77.     Defendant Portfolio further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information for a period of time subsequent to receiving Plaintiff's dispute from Experian and prior to the commencement of this action.

78.     Trans Union responded to Plaintiff's initial dispute, claiming the information was reported verified as accurate and the information was updated. This response confirms that TransUnion communicated Plaintiff's dispute to Portfolio.

79.     Plaintiff sent correspondence directly to Portfolio, requesting that Portfolio verify and correct the erroneous and unverified representations made by Portfolio in his credit file.

80.     Upon the Plaintiff's request for verification and correction, and in accordance with its standard procedures, Portfolio did not evaluate or consider any of Plaintiff's information, claims or evidence and repeatedly failed to reinvestigate the matter.

81.     Portfolio failed to conduct even a cursory investigation by failing to analyze additional information that would have confirmed the veracity of Plaintiff's disputes.

82.     By its actions as described herein, Portfolio furnished communicated false credit information in an attempt to oppress and harass Plaintiff into paying more money that what Plaintiff actually owed.

### *Plaintiff Suffered Actual Harm*

83.     Defendants have continued to report the erroneous Portfolio account on the Plaintiff's credit report, despite being notified that Plaintiff was not the debtor and a victim of identity theft.

84.     Plaintiff has been attempting to resolve these matters with Defendants for over one year and his credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

85.     As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

a.   Stress associated with multiple denials for personal loans, credit cards, and delays in applying for future lines of credit;

b.   Monies lost by attempting to fix his credit, e.g. communication costs, postage for disputes;

c.   Loss of time attempting to cure the error;

     d.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

86.     Stress associated with hundreds of hours attempting to resolve this matter in the last year.

### *Defendants' Conduct Was Willful*

87.     The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

88.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

89.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

90.     The CRA Defendants have received many thousands of disputes and other complaints regarding the creditors at issue in this case – sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

91.     Just in federal court alone, during the last decade the creditor-furnishers disputed by Plaintiff has had to defend collectively over 1,000 consumer lawsuits.

92.     In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

93.     The CRA Defendants knew or should have known of this litigation history.  They use and have access to PACER to investigate and monitor such consumer complaints.

94.     The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

95.     Each Defendant regularly receives unredacted consumer dispute details from this database.

96.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

97.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

98.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

99.     Further, over 35,000 of the CFPB complaints against Equifax, more than 33,000 complaints as to Experian, and just shy of 38,000 against TransUnion were based largely on their failure to reasonably investigate consumer disputes.

100.    Portfolio has nearly 400 such complaints.

101.    Just in the last 12 months alone, Experian, Equifax, and TransUnion have each been sued on by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the

consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

102.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

103.    Experian and Equifax have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc*., 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

104.    Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b)

(1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.

To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

105.    TransUnion has long been on even clearer notice.  The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a TransUnion case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). TransUnion's notice was so substantial that one District Court instructed the jury in a § 1681i(a) trial:

In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888 (E.D. Va. Aug. 27, 2007)

106.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

107.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

108.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering – even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

109.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading egal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[4]

110.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with

---

[3] Available at https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

[4] Available at https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

111.    Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

112.    Despite the notice and judicial, regulatory and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

113.    Defendants' procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT 1: AGAINST EXPERIAN, EQUIFAX, AND TRANSUNION
### Violation of § 1681e(b) of the FCRA

114.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

115.    Defendants Experian, Equifax, and Trans Union willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiff.

116.    As a result of this conduct, action and inaction of Experian, Equifax and TransUnion, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why she lost the ability to benefit from credit.

117.    Further, after the Plaintiff's details disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, both Equifax and TransUnion ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

118.    Each defendant furnished multiple consumer reports to third parties containing the inaccurate tradeline information and each Defendant did so after receiving notice of these inaccuracies.

119. Experian, Equifax and Trans Union's conduct, action and inaction was willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

120. As a result of Experian, Equifax, and Trans Union's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

121. The Plaintiff is entitled to recover costs and attorney's fees from Equifax and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT 2: AGAINST EXPERIAN, EQUIFAX, AND TRANSUNION
## <u>Violation of § 1681i of the FCRA</u>

122. The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

123. Experian, Equifax and TransUnion willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in the Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to Plaintiff's creditors and/or creditors' attorneys; by failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

124. Further, both Equifax and Trans Union violated Section 1681i by conducting ***no investigation at all***. Section 1681i demands that when Plaintiff notified each CRA directly of his disputes, that party—the consumer reporting agency who received the disputes—must investigate those disputes. The statute does not contemplate someone other than Equifax or Trans Union conducting the investigation.

125.   Yet, both Equifax and Trans Union used an unrelated third-party, Intelenet, over which neither CRA has control to conduct its investigations. Intelenet is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax and Trans Union therefore violated 1681i on this basis because they sent Plaintiff's disputes away to a company that was not their controlled agent rather than investigating them as required.

126.   As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

127.   Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

128.   The Plaintiff is entitled to recover costs and attorneys' fees from Experian, Equifax, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT 3: AGAINST DEFENDANT PORTFOLIO
### Violation of § 1681s-2(b)(1)(A) of the FCRA

129.   The Plaintiff realleges and incorporates the foregoing paragraphs above as if fully set out herein.

130.   Defendant Portfolio violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of the Plaintiff's dispute after said dispute was furnished to Portfolio by Experian, Equifax and Trans Union.

131.   As a result of this conduct, action and inaction of Portfolio, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and

emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

132.    Portfolio's conduct, action and inaction was willful, it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

133.    The Plaintiff is entitled to recover costs and attorneys' fees from Portfolio in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT 4: AGAINST DEFENDANT PORTFOLIO**
**Violation of § 1681s-2(b)(1)(E) of the FCRA**

134.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

135.    Defendant Portfolio violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's dispute from Experian, Equifax, and Trans Union and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Portfolio's failure to investigate as articulated herein, after Portfolio received notice of Plaintiff's dispute from Experian, Equifax, and TransUnion.

136.    As a result of this conduct, action and inaction of Portfolio, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

137.    Portfolio's conduct, action and inaction was willful, it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

138.    The Plaintiff is entitled to recover costs and attorneys' fees from Portfolio in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## JURY DEMAND

139.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory and punitive damages against Defendants; for his attorneys' fees and costs; for prejudgment and post-judgment interest at the judgment rate; specific performance and injunctive relief; and such other relief the Court deemsjust and proper.

December 10, 2020.

Respectfully Submitted,
JIMMY SUTTON,

By:  __/s/ Leonard A. Bennett__
Leonard A. Bennett, VSB #37523
Craig Marchiando, VSB #89736
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 – Telephone
(757) 930-3662 – Facsimile
lenbennett@clalegal.com
craig@clalegal.com